UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GRETA CAZENAVE, ET AL.                    CIVIL ACTION

VERSUS                                     NUMBER: 00-1246

SHERIFF CHARLES FOTI, JR., ET AL.          SECTION: "A"(5)


## ORDER AND REASONS

Presently before the Court is the motion by class counsel for final approval of class action settlement and application for attorneys fees and costs. (Rec. doc. 174). Also before the Court is plaintiffs' motion for incentive awards for class representatives. (Rec. doc. 174, 175). In connection therewith the Court received arguments at the fairness hearing held on September 13, 2007 which have been considered. (Rec. doc. 172). The Court has also reviewed the written memoranda and supporting documentation submitted by all parties, including numerous affidavits and declarations submitted by counsel and class administrators. Lastly, the Court has examined the procedural record and applied its own knowledge of the case accumulated

through is active involvement in this litigation since its inception. For the following reasons, plaintiffs' motions for final approval of class action settlement, application for incentive awards and application for attorneys' fees and costs are GRANTED because the Court finds that the proposed settlement of this action is fair, reasonable and adequate and that the attorneys' fees sought have well been earned.

## PROCEDURAL HISTORY

On April 25, 2000, an initial complaint was filed herein by plaintiffs, Greta Cazenave[1]/, Janet Densmore[2]/, Jeff Brite and William Brice White III. (Rec. doc. 1). Additional class representatives were added through an unopposed motion filed on November 24, 2003. (Rec. doc. 102).

On July 25, 2000, plaintiffs filed a motion to certify a class herein. (Rec. doc. 5). In that document, plaintiffs alleged that defendants had a policy, practice and/or custom whereby arrestees charged with minor offenses and detained pending the posting of bond were subjected to strip searches and/or visual body cavity

---

[1]/ Greta Casenave withdrew as a class plaintiff per motion filed on December 15, 2003. (Rec. doc. 104). She opted out of the class action on May 14, 2004. (Rec. doc. 120).

[2]/ Janet Densmore subsequently withdrew as a plaintiff and class representative in this matter, preserving her rights to proceed in another litigation. (Rec. doc. 3).

searches without reasonable suspicion that such persons were hiding weapons or contraband.   The motion further alleged that, despite the ruling in <u>Kelly v. Foti</u>, 77 F.3d 819 (5th Cir.), <u>reh'g en banc denied</u>, 85 F.3d 627 (5th Cir. 1996), no change in the policy or practice had been implemented by defendants.

Plaintiffs sought certification of a class pursuant to Rule 23 (a) and (b)(3), Fed. R. Civ. P., which they defined as follows:

> all persons arrested for minor offenses and detained pending the posting of bond who were strip searched in facilities operated by the Orleans Parish Criminal Sheriff's Office pursuant to defendants' policy, practice and/or custom requiring that these searches be conducted without reasonable, particularized suspicion that the arrestee is hiding weapons or contraband.

In that motion, plaintiffs went on to argue that every federal circuit court of appeals having occasion to rule on this issue, including the First, Second, Fourth, Sixth, Seventh, Eighth, Ninth and Tenth Circuits, had held in accordance with the rationale expressed in <u>Kelly</u>, <u>supra</u>.

Issue was joined on July 28, 2000 when defendants filed an answer to plaintiffs' amended complaint. (Rec. doc 9).  On August 28, 2000, a consent to proceed before the undersigned, pursuant to 28 U.S.C. §636(c), was entered into the record. (Rec. doc. 12).

Thereafter, the Court held a status conference on the motion for class certification, established a discovery schedule on the motion and set forth a briefing schedule for the parties.  (Rec.

doc. 10).  A hearing date of November 8, 2000 was established on the class certification motion. (Id.).

The first motion for contempt and sanctions filed by plaintiffs for failure to provide discovery was set for hearing on October 4, 2000. (Rec. doc. 17).  Defendants were ordered, with specifics, to comply with plaintiffs motion. (Rec. doc. 21).

At a status conference held on October 25, 2000, the parties jointly agreed that the class certification hearing could not go forward in November, 2000 as previously established.  (Rec. doc. 27). That date was vacated and a further status conference was scheduled for December 5, 2000.  (Id.).  In the interim, counsel were ordered to work on a proposed change of policy dealing with strip searches in the jail. (Id.).

At the status conference held on December 5, 2000, a proposed policy change was discussed with the Court which, if acceptable to the Sheriff, would moot the issue of affirmative injunctive relief in this litigation.  (Rec. doc. 29). Counsel for the Sheriff was ordered to advise the Court and all parties, on or before December 12, 2000, whether the Sheriff would implement the policy discussed. (Id.).  The Court further noted that the parties were in complete disagreement as to whether a damage class could be certified herein.  Briefing on this issue was ordered by the Court. (Id.).

On March 20, 2001, the Court re-set the hearing on plaintiffs'

motion to certify class for April 4, 2001. (Rec. doc. 37).  Joint stipulations were entered for purposes of class certification on March 23, 2001. (Rec. doc. 36).  Supplemental briefing on this issue was scheduled by the Court.  (Rec. doc. 37).  Those dates were subsequently extended on an unopposed motion from the defendants. (Rec. doc. 40).

Plaintiffs sought leave to propound additional discovery pertaining to class certification on May 24, 2001. (Rec. doc. 42). That motion was granted. (Rec. doc. 44).  The parties were further advised that, since the issue of injunctive relief still had not been amicably resolved, the Court would address that issue on June 22, 2001. (Id.).

Following additional status conferences with the parties, a consent decree for injunctive and declaratory relief was entered by the Court on January 15, 2002. (Rec. doc. 54).  The decree was to be implemented within 30 days of its entry.  (Id.). Monitoring for a period of one year was also provided for in the consent decree. (Id.).

At a status conference held on February 28, 2002, plaintiffs alleged a violation of the newly entered consent decree which the Court could not resolve in the conference format.  (Rec. doc. 57). Plaintiffs' counsel were instructed to file a specific motion dealing with the issue. (Id.).  That motion was filed and a hearing

was scheduled for May 15, 2002. (Rec. docs. 59, 60).  A joint supplemental consent decree was entered on this issue, referred to as the "Change-Out" Procedure, on May 20, 2002.  (Rec. doc. 62).

In August, 2002, plaintiffs sought class certification for liability purposes only pursuant to Rule 23(c)(4), Fed. R. Civ. P. (Rec. doc. 65).  That motion was opposed by the defense. (Rec. Doc. 69).  However, by September 19, 2002, the parties had come to an agreement on this issue, for liability purposes, to certify two classes of individuals.  The Court ordered the parties to make a joint submission to specifically define those two classes. (Rec. doc. 70).

Per judgment of January 3, 2003, a class of individuals, for liability purposes only, was certified by the Court as follows:

> Every person arrested only on "minor offenses" (as defined below) and thereafter confined in any facility of the Orleans Parish Criminal Sheriff's Office (OPCSO) who, on or after April 25, 1999, was required to submit to either or both of the following procedures, prior to his or her first court appearance, pursuant to a blanket policy, practice or custom of the OPCSO and applicable to all arrestees to be admitted to general population of the jail:
>
> (A) The removal or rearrangement of some or all of the arrestee's clothing, including undergarments, in the presence of OPCSO deputies and/or other detainees, resulting in the exposure of the arrestee's genital area, anus, buttocks, and/or breasts (in the case of female arrestees) and the subsequent visual inspection of the arrestee by OPCSO deputy or deputies; and/or
>
> (B) The removal or rearrangement of some or all of the arrestee's clothing, including undergarments, in order to

change into OPCSO supplied garments under circumstances which allowed OPCSO deputies and/or other detainees the ability to view his or her genital area, anus, buttocks and/or (in the case of female arrestees) breasts.

As used herein "minor offenses" includes one or more traffic offenses, misdemeanors, petty offenses, or violations of municipal or parish ordinances, none of which involves weapons or controlled dangerous substances.

As used herein "visual inspection by an OPCSO deputy or deputies" includes inspection of the arrestees' genitalia, buttocks, anal cavity, vaginal cavity and/or female breasts.

(Rec. doc. 71).

Plaintiffs' counsel thereafter filed a motion to extend the monitoring period and to extend the time for filing a request for attorneys' fees and costs.   (Rec. doc. 72).   That motion was granted on January 21, 2003.   (Rec. doc. 74).

A further status conference was convened on February 25, 2003 to establish a protocol for proceeding with the remaining portions of this case.  (Rec. doc. 76).  At that time counsel were ordered to formulate a case management order for submission to the Court on or before April 15, 2003.  (Rec. doc. 76).  On April 22, 2003, the parties furnished the Court with a joint stipulation of findings of fact pertaining to those individuals in Sub-class A defined above. (Rec. doc. 77).  More than 67,000 individuals were identified as being part of this group. (Id.).

A joint proposed case management plan was furnished to the Court on April 22, 2003. (Rec. doc. 78).  At a status conference

held on May 15, 2003, counsel were ordered to file a motion for summary judgment on the issue of liability pertaining to the claims of those individuals identified as members of Sub-Class A, also known as the "Kelly Class". (Rec. doc. 80). That motion was filed on June 6, 2003 and oral argument was set on the motion for August 27, 2003. (Rec. docs. 81, 82)

On June 26, 2003 a second motion for contempt and sanctions was filed by plaintiffs for violation of the consent decrees entered on January 15, 2002 and May 20, 2002. (Rec. doc. 84). On that same date, the Court signed an unopposed motion extending the monitoring period in connection with the Court's prior orders. (Rec. doc. 86).

On June 27, 2003, plaintiffs' counsel filed a motion for partial summary judgment on the issue of liability as to Sub-class B individuals which was set for hearing on August 27, 2003. (Rec. doc. 85). The Court set oral argument on the plaintiffs' motion for contempt and sanctions for the same date. (Rec. doc. 87). Plaintiffs subsequently requested an evidentiary hearing on the motion for contempt and sanctions which the Court granted and scheduled for August 27, 2003. (Rec. doc. 93).

On August 21, 2003, a status conference was conducted with the parties at which time avenues pertaining to settlement of this matter were discussed. (Rec. doc. 97). The Court also ordered the

parties to advise in writing by August 27th whether the pending motions for summary judgment and contempt could be moved to a different date and time. (Id.).

On September 5, 2003, a further status conference was conducted with counsel. (Rec. doc. 98). A resolution of the motion for contempt had been worked out by counsel, with which the Court was able to concur.  That resolution was memorialized in a letter which the Court attached to its minute entry. (Id.).  At that time the parties presented the Court with a stipulated amendment to the class definition which the Court approved and which reads as follows:

> Every person arrested only on "minor offenses" (as defined below) and thereafter confined in any facility of the Orleans Parish Criminal Sheriff's office (OPCSO), who, on or after April 25, 1999, was required to submit to any or all of the following procedures, prior to his or her first court appearance, pursuant to a blanket policy, practice or custom of the OPCSO and applicable to all arrestees to be admitted to general population of the jail:
>
> (A) The removal or rearrangement of some or all of the arrestee's clothing, including undergarments, in the presence of OPCSO deputies and/or other detainees, resulting in the exposure of the arrestee's genital area, anus, buttocks, and/or breasts (in the case of female arrestees) and the subsequent visual inspection of the arrestee by OPCSO deputy or deputies; and/or
>
> (B) The removal or rearrangment of some or all of the arrestee's clothing, including undergarments, in order to change into OPCSO supplied garments under circumstances which allowed OPCSO deputies and/or other detainees the ability to view his or her genital area, anus, buttocks and/or (in the case of female arrestees) breasts; and/or

(C) The removal or rearrangement of some or all of the arrestee's clothing or clothing furnished by OPCSO, including undergarments, in the presence of OPCSO deputies and/or other detainees, which resulted in the exposure of the arrestee's genital area, anus, buttocks and/or breasts (in the case of female arrestees) to others in violation of the orders of this Court of January 15, 2002 or May 20, 2002.

As used herein "minor offense" includes one or more traffic offenses, misdemeanors, petty offenses, or violations of municipal or parish ordinances, none of which involves weapons or controlled dangerous substances.

As used herein "visual inspection by an OPCSO deputy or deputies" includes inspection of the arrestee's genitalia, buttocks, anal cavity, vaginal cavity and/or female breasts.

(<u>Id</u>. at pp.14-15).

The Court encouraged the parties to begin working toward settlement of the remaining issues in the case. (Rec. doc. 99). However, shortly thereafter, a further motion for contempt and sanctions for violation of this Court's order of September 5, 2003 was filed by plaintiffs. (Rec. doc. 100).

A status conference was conducted on November 13, 2003; counsel were ordered to research the issue of whether a damage class could be certified which contained a non-opt out provision. (Rec. doc. 101). It was further ordered that plaintiffs' motion for contempt would be heard on November 26th. (<u>Id</u>.). That date was subsequently continued. (Rec. doc. 109).

On January 16, 2004, defendants filed a motion to certify a class or subclasses under Rule 23(b)(1)(B), Fed. R. Civ. P., which

was scheduled for hearing on March 1, 2004. (Rec. doc. 107).  On March 29, 2004, the parties filed a joint motion (Rec. doc. 112) withdrawing the following motions without prejudice in order to pursue settlement: 1) plaintiffs' motion for summary judgment on issues of liability only for Sub-Class A ("Kelly Class") (Rec. doc. 81); 2) plaintiffs' motion for partial summary judgment on issue of liability only for Sub-class B (Rec. doc. 85); 3) plaintiffs' motion for notice to class members (Rec. doc. 91); 4) plaintiffs' motion for contempt (Rec. doc. 100); and 5) defendants' motion to certify a class or sub-classes under Fed. R. Civ. P. 23(b)(1)(B) (Rec. doc. 107).  The Court appointed Mr. Roger Larue of Mediation Arbitration Professional Systems, Inc. to attempt to settle these claims.  (Rec. doc. 118).

Following that mediation, the Court ordered the parties to furnish a term sheet pertaining to their preliminary agreement of settlement and an escrow agreement allowing for the deposit of settlement funds.  (Rec. docs. 122, 123). A proposed public announcement for publication  to class members was also to be furnished by September 30, 2004. (Id.).  A joint motion for preliminary approval of the class action settlement pursuant to Rule 23(b)(1)(B) was submitted to the Court.  (Rec. doc. 126).  At a status conference on May 10, 2005, the defense was to indicate whether it would agree to amend the proposed settlement to allow

for the settlement to go forward under Rule 23(b)(2) rather than Rule 23(b)(1)(B). An evidentiary hearing was scheduled for August 29, 2005. (Rec. doc. 130). Due to ongoing negotiations among the parties that hearing date was vacated on August 16, 2005. (Rec. doc. 138).

Ultimately, on January 11, 2007, a motion was presented to the Court for preliminary approval of the class action settlement agreement, which was granted by the Court. (Rec. doc. 154). That document reaffirmed the previous certification of the class and sub-classes set forth above under Fed. R. Civ. P. 23(b)(2) for injunctive relief and found that institutional reform had been accomplished. The order further found that monetary relief pursuant to Rule 23(b)(3) was fair and reasonable under the circumstances of this case.

The ultimate class was defined as follows:

Every person arrested only on "minor offenses" (as defined below) who entered the Intake and Processing Center ("IPC") operated by the Orleans Parish Criminal Sheriffs Office ("OPCSO"),during the time periods set forth below, who was required to submit to any or all of the following procedures, prior to his or her first court appearance or release, whichever came first, pursuant to a blanket policy, practice or custom of the OPCSO applicable to all arrestees to be admitted to the general population of the jail:

**Sub-Class "A" (Or the "Kelly" class):**

(A) the removal or rearrangement of some or all of the arrestee's clothing, including undergarments, in the presence of OPCSO deputies and/or other detainees, resulting in the

exposure of the arrestee's genital area, anus, buttocks, and/or breasts (in the case of arrestee's genital area, anus, buttocks and/or breasts (in the case of female arrestees) and the subsequent visual inspection of the arrestee's private parts by OPCSO deputy or deputies, which occurred from April 25, 1999 through February 14, 2002;

**Sub-Class "B" (or the "Change-Out" class):**

(B) The removal or rearrangement of some or all of the arrestee's clothing, including undergarments, in order to change into OPCSO supplied garments under circumstances which allowed OPCSO deputies and/or other detainees the ability to view his or her genital area, anus, buttocks and/or (in the case of female arrestees) breasts, which occurred from February 15, 2002 through May 31, 2002;

**Sub-Class "C" (or the "Contempt" or "Templeman III" class):**

(C) the removal or rearrangement of some or all of a male arrestee's clothing or clothing furnished by OPCSO including undergarments, in the presence of OPCSO deputies and/or other detainees, which resulted in the exposure of the arrestee's genital area, anus, and/or buttocks to others in violation of the Court's Order of May 20, 2002 as the arrestee was being admitted to the receiving tier at Templeman III from the IPC, which occurred from June 1, 2002 through May 331, 2003.

As used herein "minor offense" includes one or more traffic offenses, misdemeanors, petty offenses, or violations of municipal or parish ordinances, none of which involves weapons or controlled dangerous substances. This definition specifically excludes any and all felonies.

As used herein the arrestee's private parts means inspection of the arrestees' genitalia, buttocks, anal cavity, vaginal cavity and/or female breasts buy an OPCSO deputy or deputies.

(Rec. doc. 154, pp. 4-6).

The Court found that the current plaintiffs were adequate class representatives and that class counsel had properly represented the class. The Court approved the form of notice to

13

class members and further approved Analytics, Inc. to be the claims administrator.  A date to begin dissemination of the notice was established as was a date for a Fairness Hearing, which went forward on September 13, 2007. (Id.).  At the Fairness Hearing, defendants waived their right to opt out of the settlement presently before the Court.

## NOTICE

The Court appointed Analytics, Inc., hereinafter referred to as Analytics, to identify potential class members, mail a class notice and proof of claim and release to those individuals and to publish summary notice of this matter.  Per affidavit of Richard W. Simmons, President of Analytics, dated September 12, 2007, which was provided to the Court at the Fairness Hearing, being identified as Exhibit B annexed to the Motion for Final Approval of Class Action Settlement and Application for Attorneys  Fees, the Court was advised of the protocol followed by Analytics in providing notice to class members.  (Rec. doc. 174). Analytics has extensive experience since 1974 in locating class action claimants. Analytics assisted with the development of a notice plan with the objective of providing effective and efficient notice to class members regarding the pending class action settlement, providing them with the opportunity to see, read and understand their rights and respond as they saw fit.  The notice plan took into account the

14

location of individual class members displaced as a result of the aftermath of Hurricane Katrina, subsequent to their arrest, booking and search and prior to the mailing of the Class Notice.

According to the affidavit of Mr. Simmons, the following factors were taken into consideration in developing a notice plan that was both cost-effective and reasonably designed to provide notice to class members regarding their rights:

A.  A complete list of class members, based upon information provided by class members and collected by the Orleans Parish Criminal Sheriff's Office (OPCSO) personnel at the time of their booking was made available to Analytics by the OPCSO in computer retrievable format.

B.  Based upon the OPCSO data, the class consists of more than 80,481 individuals derived from 143,735 bookings for the descriptions and time periods provided by the Class/Sub-Class definitions.  OPSCO has represented that this data consisted of all computer retrievable data maintained by that office regarding potential class members.

C.  Of the 143,735 booking records provided by OPCSO, 110,545 listed an address located in the City of New Orleans (76.9%); 10,843 listed an address in Jefferson Parish (7.5%); 1,602 listed an address in St. Bernard Parish (1.1%); 192 listed an address in Plaquemines Parish (.1%) and 1,137 provided a St. Tammany Parish address (.8%).  Accordingly, it is apparent that a total of 124,319 or 86.5% of the potential class members lived in a 5 parish area in and around the City of New Orleans.

D.  Hurricane Katrina displaced many class members to other areas of the country.  However, it was determined that most people concentrated primarily in other parts of Louisiana and in Alabama, Georgia, Florida, Mississippi and Texas.

Analytics provided direct mailed notice to all class members for whom a mailable street address was available.  Prior to that,

mailing addresses were standardized to U.S. Postal Service (USPS) specifications, with obvious misspellings, abbreviations and typographical errors corrected; addresses were updated using the NCOA database maintained by the USPS, which provided changes of addresses submitted by individuals and families dislocated by Hurricane Katrina; addresses were updated using a commercially available database maintained by Lexis/Accurint; after updating with commercially available data, addresses were re-standardized and passed against the NCOA database to capture any recent changes not yet reflected in the commercial databases.

The notice package in this matter consisted of: 1) an envelope specifically identifying the content and importance of the notice package; 2) a plain language Class Notice providing class members with information regarding the settlement, their rights and options; and 3) a claim form personalized with relevant data regarding each claimant's claim such as the subclass that they were assigned to, based upon OPCSO data, and a definition of each subclass for simplified claim submission, with referral to more detailed information if needed.  Copies of the Class Notice and Claim Form as mailed are attached as Exhibit B(2) to Rec. doc. 174.

Direct mailing of notices was sent, by first class mail, to 79,348 individuals at one or more addresses.  This accounted for a direct mailing to 92.7% of the class as a whole.

The direct mailed Class Notice was supplemented with: 1) a published notice campaign targeted to geographic regions with large concentrations of class members; 2) the dissemination of information regarding the settlement through use of the internet and 3) an outreach program targeted to homeless class members.

Class counsel informed Analytics that they had received data from the Louisiana Secretary of State's Office indicating that newspaper advertisements were placed by that Office regarding the mayoral election in the City of New Orleans in April, 2006 and May, 2006. The Louisiana Secretary of State ran advertisements in selected major metropolitan areas in Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, Tennessee, and Texas where it had been determined that there were concentrations of displaced persons from the City. Analytics, therefore, published notices in those same areas identified by the Louisiana Secretary of State's Office as having had significant numbers of Orleans Parish post-Katrina residents. That resulted in paid advertisements being placed in 27 newspapers and specialty publications in 19 cities, reaching a potential audience of approximately 4.2 million readers, over the course of six months. Publication notices were given in the New Orleans area as well.

Analytics also established an informational website with a domain name of www.nolastripsearch.com where class members could

obtain additional information and documents regarding the settlement, including the settlement agreement, answers to common questions, a detailed notice, a claim form and other pertinent facts.  A link to this website was also published at Analytics' website.   The informational website was indexed by major search engines such as Google and Yahoo!. Suffice it to say that there were a significant number of "hits" to the strip search website.

Analytics also established a toll free, interactive voice telephone support number to assist potential class members and to answer questions regarding the settlement.   This system was operative 24 hours per day, 7 days per week.   During business hours, class members could request to speak to a service agent to assist them and after hours could leave a voice mail message, having their call returned the following day.

Outreach to potential homeless class members was handled by placement of notices in homeless shelters, providing potential class members with information regarding the settlement and an opportunity to obtain the detailed notice package.  Class counsel conducted meetings with homeless shelters and homeless advocacy and support groups in April and May, 2007.

In response to this notice plan, Analytics received a total of 6,736 proof of claim and release forms of which 6,328 were timely-filed pursuant to Court order.  5,745 of these filings have been

ultimately determined by Analytics to have been made by valid and authorized claimants. Those claimants are listed in Exhibit C annexed to the supplemental report of Analytics dated July 9, 2008. (Rec. doc. 184).

According to Rule 23(e), class notice must be given "in a reasonable manner." Fed. R. Civ. P. 23(e)(1)(B). "There are no rigid rules to determine whether a settlement notice to class members satisfies constitutional and Rule 23(e) requirements...." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 114 (2nd Cir.), cert. denied sub nom. 544 U.S. 1044, 125 S.Ct. 2277 (2005). In some circumstances, reasonable notice may require individual notice in the manner required by Rule 23(c)(2)(B) which provides in pertinent part as follows:

> For any class certified under Rule 23(b)(3), the court must direct to class members the **best notice practicable under the circumstances**, including individual notice to all members who can be identified through reasonable effort.
>
>> Fed. R. Civ. P. 23(c)(2)(B) (emphasis added); see also Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 173, 94 S.Ct. 2150 (1974) (elaborating on the constitutional dimensions of notice under the Due Process Clause).

However, actual notice to each party who would be bound by the adjudication of the class action is not required. This is because a construction of the Due Process Clause which would place

impossible or impractical obstacles in the way could not be justified. <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313-14, 70 S.Ct. 652, 657 (1950). Therefore, when courts have evaluated whether a settlement notice is adequate, the focus is not on actual notice rates, but rather whether the best notice practicable to individuals under the circumstances was achieved through reasonable effort. <u>DeJulius v. New England Health Care Employees Pension Fund</u>, 429 F.3d 935, 944 (10th Cir. 2005)(citing <u>In re Integra Realty Res., Inc.</u>, 262 F.3d 1089, 1110 (10th Cir. 2001) and <u>Eisen</u>, 417 U.S. at 174, 94 S.Ct. 2140). Stated another way, "the question is ... not whether some individual...got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement" <u>Torrisi v. Tucson Elec. Power Co.</u>, 8 F.3d 1370, 1375 (9th Cir. 1993), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom.</u> 512 U.S. 1220, 114 S.Ct. 2707 (1994).

Through multiple methods noted above, notice was targeted to individual class members to inform them of the pendency of the action, the proposed settlement, the settlement terms and conditions, the manner of distribution of proceeds, the date and time of the fairness hearing and to determine their interest in the settlement by informing them of their right to object. As such, the Court finds that the parties used more than reasonable efforts

to achieve the best notice practicable under the circumstances, thereby complying in all respects with Rule 23 and due process requirements.  All of the above actions lead the Court to conclude that the class members received due and adequate notice in compliance with the Court's order preliminarily approving the settlement and that these actions constituted the most reasonable manner of notice under Rule 23(e)(1)(B).

Analytics, Inc., the Court appointed administrator, has recommended that those individuals listed on Exhibit C of the supplemental report of Richard Simmons dated July 9, 2008 be approved as authorized claimants.  (Rec. doc. 184).  The Court concurs and does so.  Pursuant to the further recommendation of Analytics, Inc., any claim which was deficient, although initially timely-filed, will be rejected if not cured in a timely fashion. Specific individuals whose claims information was incomplete were given the opportunity to cure initial deficiencies and did not do so.  Subsequent to the Fairness Hearing, Analytics, Inc. has received additional claims which have not been processed and the Court directs Analytics, Inc. that no further processing of these claims should occur.

Because of the extensive nature of this class, the Court opts to impose bright-line deadlines for the filing of claims and the curing of deficiencies.  With a finite fund of money, to do

otherwise makes it impossible to calculate the amount claimants who followed instructions should receive, needlessly increases costs and prevents closure of this matter.

## FAIRNESS OF THE SETTLEMENT AGREEMENT

Before approving a class settlement that binds members of the class, the Court must conduct a Fairness Hearing at which the parties proposing the settlement must present evidence that the settlement is "fair, adequate, and reasonable." Fed. R. Civ. P. 23(e)(1)(C); <u>Newby v. Enron Corp.</u>, 394 F.3d 296, 300 (5th Cir. 2004); <u>Parker v. Anderson</u>, 667 F.2d 1204, 1209 (5th Cir.), <u>cert</u>. <u>denied</u>, 459 U.S. 828, 103 S.Ct. 63 (1982). Accordingly, on September 13, 2007, the Court held a Fairness Hearing to determine whether it should grant final approval of the settlement proposed in this case.

At that hearing, the Court heard arguments from proponent counsel and defense counsel. The Court advised all present that anyone who had filed a formal, timely objection to the settlement, if present, would be allowed to speak as well. No one in the latter category came forward at the time of the hearing. Only individuals favoring the settlement were present and they were allowed to speak through their counsel of record, class counsel herein. The Court took note at the time that the **vast** majority of class members were in favor of the proffered settlement. The Court

also received into evidence the affidavits and declarations of class counsel, class representatives, experts as to the fairness, reasonableness and adequacy of the settlement and representatives of Analytics, Inc. and made same part of the record herein.

The Court must be exacting and thorough in analyzing whether the settlement is in the best interest of class members, *Manual for Complex Litigation (Fourth) §21.61 (2004)*, and should provide the basis for its conclusions in a reasoned opinion.  For a Court should not give boilerplate approval to a settlement but must analyze the facts and law supporting its conclusion.  <u>In re Combustion, Inc.</u>, 968 F. Supp. 1116, 1124-25 (W.D. La. 1997).

When evaluating a proposed settlement, the Court must compare its terms with the rewards the class would likely receive following a trial and judgment in its favor.  <u>Cotton v. Hinton</u>, 559 F.2d 1326, 1330 (5th Cir. 1977).  However, the merits of the case are not at issue during the settlement review process.  <u>Reed v. Gen. Motors Corp.</u>, 703 F.2d 170, 172 (5th Cir. 1983).  Otherwise, a primary goal of settlement, i.e., to avoid the expense and delay of trial, would be thwarted.  <u>Id.</u>  The Court is also limited in that it may not make unilateral modifications or alterations to the proposed settlement, but rather may only accept or reject the agreement as a whole.  <u>Evans v. Jeff D.</u>, 475 U.S. 717, 726-27, 106 S.Ct. 1531, 1537 (1986).  The Court may not resolve contested issues of fact or

law, but instead is concerned with the overall fairness, reasonableness and adequacy of the proposed settlement as compared to the alternative of litigation.

Though Rule 23 does not elaborate specific factors necessary for settlement approval, the Fifth Circuit has cited six factors that a district court should take into consideration when evaluating a proposed class action settlement. These factors include:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and the absent class members.

Reed, 703 F.2d at 172.

The Court will consider these six factors, taking into account the statements by counsel, class representatives, and objectors and the Court's own knowledge of the litigation obtained from its management and involvement in the case since its inception. Before proceeding to the analysis, it is relevant to note that there is a "strong judicial policy favoring the resolution of disputes through settlement" and that a presumption is made in favor of the settlement's fairness, absent contrary evidence. Smith v. Crystian, 91 Fed. Appx. 952, 955 (5th Cir. 2004), cert. denied sub nom. 543 U.S. 1089, 125 S.Ct. 972 (2005). The public interest

24

favoring settlement is especially strong in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses.  <u>In re Train Derailment Near Amite La.</u>, 2006 WL 1561470 at *11 (E.D. La. 2006).  Ultimately, however, the proponents of the settlement bear the burden of demonstrating that the settlement is fair, reasonable and adequate.  <u>Holmes v. Continental Can Co.</u>, 706 F.2d 1144, 1147 (11th Cir. 1983).

<u>**FRAUD OR COLLUSION**</u>

A strong presumption exists in favor of settlement if the court determines that the settlement resulted from arms-length negotiations between experienced counsel and was not tainted by fraud or collusion.  <u>Wal-Mart Stores</u>, 396 F.3d at 116.  In connection with the settlement process, the Court referred the parties to Mr. Roger J. Larue of Mediation Arbitration Professional Systems, Inc. on April 23, 2004.  The affidavit of the mediator has been made part of the record herein.  (Rec. doc. 174, Exhibit D).

Mr. Larue noted that there were significant disputes between the parties during the course of the mediation which occurred on May 18 and 19, 2004.  Not only was the mediation attended by counsel but by several of the class representatives as well as by Mr. Michael Geerken, the CAO of the Orleans Parish Criminal Sheriff's office.  A "palpable amount of acrimony between the

25

parties" was noted by the mediator and the parties were far apart in terms of their respective views of the case.

Ultimately, the parties were able to reach a resolution of the claims which the mediator believes is the "result of good faith negotiations between well-informed, knowledgeable and experienced counsel that was reached after extensive arms-length negotiations". The mediator further opined that "all sides vigorously and aggressively argued their positions" and that all "were aware of the risks inherent in this litigation and the complexity, expense, and uncertainty" of continuing forward.

The Court notes, through hands-on dealing with counsel for the parties herein, that this case was aggressively pursued and defended by both sides. Class counsel initiated discovery at the early stages of this matter to obtain booking records from the Sheriff's office to identify, investigate and protect the class interest. In many instances a motion to compel was required to achieve ultimate production of information.

Class counsel identified and communicated with many members of the putative class. Indeed, this identifying information was produced to counsel in an electronic format prior to Hurricane Katrina which enabled notice of this settlement to be published to the class after massive destruction occurred at the jail following that storm. Only through the diligence of class counsel was this

information obtained and preserved in a usable format which allows this matter to go forward now to its conclusion.

After the magnitude of the potential class had been confirmed, class counsel also propounded financial discovery to each individual defendant to assess that person's ability to pay punitive damages should the case proceed to trial. Class counsel had always argued that a constitutionally defective policy and practice had been maintained at the jail after the decision in Kelly, supra, which counsel had argued exposed certain individuals to liability for punitive damages.

However, at all times, one of the major issues herein has been the practical problem of whether any of the individual defendants had the financial resources to pay a significant judgment which included an element of punitive damages. Clearly, the Sheriff's Office itself would not be subject to an award of punitive damages. Nor, for that matter, could the Sheriff's Office stand in judgment for any amount because it is not a legal entity capable of being sued. Cozzo v. Tangipahoa Parish Council-President Government, 279 F.3d 273, 283 (5th Cir. 2002).

Neither could the Sheriff or his subordinates in their official capacities be cast for punitive damages. This would, in effect, be a judgment against the coffers of a governmental entity, itself, against which an award of punitive damages would be

prohibited.  <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762 (1981); <u>Dominque v. Lafayette City Parish Consol. Gov't.</u>, 2008 WL 728654 at *22 (W.D. La. March 17, 2008). Therefore, only in their individual capacities could the named defendants be responsible for punitive damages, even though the coffers of the public entity could be responsible for actual damages proven by plaintiffs against defendants in their official capacities.

The Court had to order the exchange of financial information as to the individual defendants, as this too was resisted. Additionally, class counsel participated in the review of the finances of the Sheriff's Office, employing a municipal finance expert to meet with the CPA of the Sheriff's Office to analyze the ability of the Office to pay any compensatory judgment that might be rendered against the defendants in their official capacities.

The Court further notes that, post Hurricane Katrina, even though a settlement figure had been agreed upon by counsel, it was unclear whether that amount would be available to the class due to the massive destruction occasioned to the Sheriff's facilities. The Court authorized the Sheriff to borrow against these funds, if need be, to get the Office up and running again following that devastating time in the City of New Orleans. Ultimately, the fund remained intact and is currently still available to the class.

As a result of this litigation, there has been a re-writing of the prior policy and practice of the Sheriff's Office pertaining to the strip searching and body cavity searching of individuals brought into the Orleans Parish Prison system.  In the second consent decree, privacy or "change out" booths, which are essentially dressing rooms, were established in the jail, which benefits a significant number of minor offenders passing through the jail each year.

The Court determines that settlement is in the best interest of the parties and the class here.  Should this matter have proceeded to trial, there were key facts disputed by both sides. Additionally, the plaintiffs are individuals who were brought to jail pursuant to an arrest and, as a practical matter, that creates the distinct possibility that these individuals would not be believed because of their past criminal records.

Furthermore, the pursuit of damage claims by members of the class, which is what this settlement addresses, could easily result in little or no money being awarded due to insufficiency of proof pertaining to each individual.  Most individuals did not have supporting medical or documentary evidence to establish an individualized claim for damages.  And, indeed, most private attorneys would not want to be burdened with the representation of an individual with such a limited damage claim.  All members of the

putative class could have hired private counsel before this litigation was instituted to deal with their strip search experiences but few, if any, did so, attesting to the difficulty in proving up damages under these circumstances and the embarrassment attendant to coming forward and pursuing such a claim.

The Court is aware of jurisprudence dealing with agreements to pay attorneys' fees and how such agreements may give rise to perceived or actual conflicts of interest, fraud or collusion. *See*, e.g., William J. Lynk, *The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class-Action Litigation*, 23 J. Legal Stud. 185, 186 (1994). The Court will, hereinafter, examine counsels' request for fees, in light of specific documentation as to time and rates to determine whether the fee sought is fair.

The Court is convinced that settlement has been achieved after arms-length negotiation and without fraud or collusion on the part of anyone. The ability of the Sheriff's Office and of the individual defendants to pay a substantial judgment has always been an issue herein as has the provable scope of damages for the individual plaintiffs. This settlement represents a brokered compromise which benefits both sides. And, more importantly, this litigation has brought an end to further continuation of what has been viewed by plaintiffs as an unconstitutional policy and practice.

30

A presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair.  In re Corrugated Container Antitrust Litig., 643 F.2d 195, 212 (5th Cir. 1981), cert. denied sub nom. 456 U.S. 1012, 102 S.Ct. 2308 and 456 U.S. 998, 102 S.Ct. 2283 (1982).  The Court believes that the quality and comprehensiveness of the benefits provided to class members under the settlement agreement adequately compensate the class members. Class counsel are skilled attorneys who have extensive experience with this type of litigation and have used this knowledge at the bargaining table to conduct meaningful negotiations.  Counsel for both sides engaged in vigorous advocacy and the settlement was achieved in the context of the adversarial process.

The Court, therefore, concludes that the proposed settlement was negotiated by the parties free of fraud or collusion.

### **COMPLEXITY, EXPENSE AND DURATION OF LITIGATION**

This litigation has been pending for some period of time. Initially, the Court focused on the request for injunctive relief which was resolved through a consent judgment.  The only remaining issue was whether a damage class should or should not be certified. Initially, the parties sought certification of a damage class under sections of Rule 26 other than Rule 26(b)(3), which the Court did not find tenable under current jurisprudence.  The Court's failure

to certify a class under another section of the Rule certainly gave rise to appealable issues.

Plaintiffs' claims for damages and defendants' response thereto are complex as are many issues in this litigation.  As noted earlier, many plaintiffs are embarrassed to come forward to discuss being strip-searched.  Few of the plaintiffs have the extensive medical records needed to prove up a comprehensive claim for post traumatic stress disorder attendant to a strip search.  It is questionable whether a trier of fact would find the plaintiffs totally believable given the fact that they were under arrest when the alleged offenses occurred.

Winning a verdict would not, _per_ _se_, mean that plaintiffs would obtain compensation.  Punitive damages would not be forthcoming against the Sheriff's Office and the individual defendants are of limited means.  The potential bankruptcy of the Sheriff's Office was also raised.

A verdict in favor of the class would surely have raised appealable issues, which would further protract this litigation in terms of time and expense.  Should the Court have opted at any point not to certify a damage class, plaintiffs' rights would have been extremely compromised because multiple individual litigations could have resulted or rights could have been lost in the entirety if plaintiffs did not obtain individual counsel to pursue them.

32

This would result in further delaying the payment of funds and running up attorneys' fees exponentially.

The Court is convinced that, but for resolution of this matter by compromise, a further complicated, lengthy and expensive enterprise would have been undergone by both sides, with no assurance as to a result.  This settlement provides the closure that all sides need to go forward.

## STAGE OF THE PROCEEDINGS AND AMOUNT OF DISCOVERY COMPLETED

The stage of the proceedings and the nature and extent of discovery can be significant factors in evaluating the fairness of a settlement.  Although it is not essential that all or nearly all discovery be completed in order for a court to conclude that this factor supports a finding of fairness, it certainly strengthens the argument for approval of settlement.  In re Corrugated Container, 643 F.2d at 211.

In this case, a significant amount of discovery had been conducted and completed.  And, the Court is convinced that the parties have sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the wisdom of settling the case.  Counsel are all seasoned practitioners in the field of §1983 matters.  The problems with proving extensive damages on the part of individual plaintiffs is palpable, given the lack of medical records pertaining to them.

Accordingly, the Court finds that the parties were fully informed of the factual and legal obstacles presented by continuing forward and possessed more than sufficient information to determine that settlement was preferable to further litigating this matter.

### PROBABILITY OF PLAINTIFFS' SUCCESS ON THE MERITS

The risks to the class if settlement had not been reached, in terms of establishing liability, damages and maintaining the class through trial were not insignificant.  While the <u>Kelly</u>, or Sub-class A class members, might have prevailed on summary judgment as to liability, damages were a larger problem in that each individual was different.  Other than their own individual testimony, most people had no medical records to support anything other than a nominal award.  Claims asserted by other proposed subclasses, such as the "change out" class, which dealt with the exposing of the naked bodies of detainees while changing into jail garb, were argued not to constitute a search of the person.  Qualified immunity issues further loomed on the "change out" issue which was not a part of the earlier <u>Kelly</u> litigation.

All class members faced the risk of having a fact finder view their damages as <u>de</u> <u>minimis</u>.  For as has been noted, "the vast majority of [strip search] claims would never be brought unless aggregated because provable actual damages are too small." <u>Tadiff v. Knox County</u>, 365 F.3d 1, 7 (1st Cir. 2004).  And even if

34

liability was a proper subject for certification, had the Court refused to certify a damage class, counsel would no longer represent these individuals and there could be no resolution of this matter on a class wide basis.  With the displacement of people following Hurricane Katrina, it is doubtful that many people who will benefit from settlement funds would have received any money or had anyone to represent them to pursue a damage claim.

The aforementioned obstacles mitigate in favor of a settlement of the claims rather than pressing forward with litigation.

### RANGE OF POSSIBLE RECOVERY

In any case there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion. Newman v. Stein, 464 F.2d 689, 692 (2nd Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 521 (1992).  A court will, therefore, determine if any legal or factual obstacles exist in a case and then inquire whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of the plaintiffs' success on the merits.  In doing so the Court must remain aware that:

> [c]ompromise is the essence of settlement and the court should
> not make the proponents of a proposed settlement justify each
> term of settlement against a hypothetical or speculative
> measure of which concessions might have been gained; inherent
> in compromise is a yielding of absolutes and abandoning of

highest hopes.

> Nelson v. Waring, 602 F. Supp.
> 410, 413 (N.D. Miss.
> 1983)(quoting Cotton v. Hinton,
> 559 F. 2d 1326, 1330 (5th Cir.
> 1977)).

The initial settlement fund herein was $9.375 million and it is currently in excess of $10 million even after taking costs of administration of the fund into account. A gross settlement in this amount is a significant achievement from any public entity but especially so from this entity which is self-insured. Depending upon which Sub-Class a person falls into, the awards are expected to range between slightly in excess of $1,000.00 for those members of Sub-Class A (the Kelly class) to about $350.00 for Sub-Class B (the change out class) and approximately $525.00 for Sub-Class C.

The settlement provides for all funds to be distributed by providing one payment to each class member. Individuals are presumed to be a member of one or more Sub-Classes if their names appear on the Sheriff's Office records. If a member falls into more than one Sub-Class, that person will receive compensation provided for the highest compensable Sub-Class into which he or she falls. Individuals receive payment without the need for any individual proof of damages or even establishing that he/she actually underwent a strip-search.

Class members had the option to exclude themselves from the

36

settlement to pursue individual claims.   The putative class, as calculated by counsel was in excess of 85,000 people.   Only 27 requests for exclusion were received.   Of this number, at least half requested never to be contacted again, stating that they wanted nothing to do with this settlement, that they expected no payment and/or denying that they were strip-searched.

District courts in other jurisdictions have approved lump-sum settlements in similar strip search class actions, with per class member payout amounts similar to those proposed in this matter.   In McBean v. City of New York, 228 F.R.D. 487 (S.D. N.Y.  2005), a settlement that provided an award of $750.00 per single strip search and $1,000.00 for multiple stip searches was found "consistent with awards for similar class action claims".   In Tyson v. City of New York, 97-CV-3762 (S.D. N.Y.), $250.00 was found adequate per class member.   An award of $426.21 for a strip-search was approved as reasonable in Williams v. Block, 97-CV-3826 (C.D. Calif.).   In Eddleman v. Jefferson County, 96 F.3d 1448 (6th Cir. 1996)(table), class members received approximately $750.00 for having been strip searched.   Although not a class action, it has been held that a nominal damage award in a strip-search case of $100.00 is acceptable.   Williams v. Kaufman County, 352 F.3d 994, 1014 (5th Cir. 2003).

The Court, therefore, finds that the estimated awards herein

fall within a range of reasonableness established through the jurisprudence.  See also Affidavit of Howard Friedman, Exhibit A, attached to Rec. doc. 174.

### OPINIONS OF CLASS COUNSEL, CLASS REPRESENTATIVES, ETC.

Counsel are the Court's "main source of information about the settlement" and, therefore, the Court will give weight to class counsel's opinion regarding the fairness of settlement.  Cotton, 559 F.2d at 1330; *Manual for Complex Litigation §21.641.*  Class counsel's opinion should be presumed reasonable because they are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit.  Boyd v. Bechtel Corp., 485 F. Supp. 610, 622 (N.D. Cal. 1979).  It is the duty of a court to give class counsel's recommendations appropriate weight in light of all the factors surrounding the settlement.  Id.

Suffice it to say that all class counsel and all class representatives believe that the proposed settlement is fair, reasonable and adequate.  Furthermore, the attitude of absent class members, expressed either directly or indirectly by their failure to object after notice or high level of participation in the proposed settlement agreement, is an additional factor on which district courts generally place heavy emphasis.  In re Microstrategy, Inc. Sec. Litig., 150 F.Supp.2d 896, 905-06 (E.D. Va. 2001).  If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.  Wal-Mart Stores, Inc., supra.  In the current litigation, any class member who felt dissatisfied with the settlement could object to

the settlement and/or exclude himself/herself from the settlement and bring an individual claim.  Only two class members timely objected[3] to the settlement and only twenty-seven people timely excluded themselves.  (Rec. doc. 174, Exh. B(14)).  The paucity of individuals who have objected or excluded themselves gives rise to a strong presumption that the settlement terms are fair and reasonable.

In summary, a review of the <u>Reed</u> factors supports a finding that the settlement should be approved.

The Court next gives consideration to the incentive awards sought by the seven class representatives in this litigation, i.e., Jeff Bright, William Brice White III, Lionel Nelson, George Wurz, Anthony Pogorzelski, Anthony Buchen and Sylvia Brown.  The Court notes that all seven individuals are of the opinion that each of them should receive the same incentive award in that all have contributed collectively and are jointly responsible for the achievements obtained herein. <u>See</u> Plaintiffs' Motion & Incorporated

---

[3] <u>See</u> Rec. doc. 174, Exhibit B(15), for the name of one individual who objected.  That individual advised that he did not want to opt out of the settlement but felt that he should receive more money as a member of Sub-Class B than he calculated he would receive.

The parties have also considered claimant # 153058 as an objector, even though Analytics did not include his name on Exhibit B(15)referenced above.  The Court has reviewed this individual's filing and notes that he is included in the list of individuals who will receive a payment.  He, too, would like to receive more money than he calculates he will receive.

Memorandum in Support of Incentive Awards for Class Representatives
(Rec. doc. 175).

It is undisputed that "[c]ourts commonly permit payments to
class representatives above those received in settlement by class
members generally." Smith v. Tower Loan of Miss., Inc., 216 F.R.D.
338, 368 (S.D. Miss. 2003), cert. denied, 543 U.S. 1089, 125 S.Ct.
972 (2005); In re Catfish Antitrust Litig., 939 F. Supp. 493, 504
(N.D. Miss. 1996).  Incentive awards are based upon the actions
that these individuals have taken to protect the interests of the
class, the degree to which the class benefitted from those actions,
the amount of time and effort the named plaintiffs expended in
pursuing the litigation and any negative effects on the named
plaintiffs.  In re Compact Disc Minimum Advertised Price Antitrust
Litig., 292 F.Supp.2d 184, 189 (D. Me. 2003).

An incentive award of $20,000.00 for each class representative
has been sought herein.  Class counsel has pointed out that such an
incentive award is consistent with incentive awards made in other
strip search cases.  See Craft v. County of San Bernardino 05-CV-
359 (C.D. Cal. March 31, 2008); Calvin v. Sheriff of Will County
and Will County, Ill., 03-CV-3086 (N.D. Ill. Nov. 27 2006); Bynum
v. District of Columbia, 412 F.Supp.2d 73, 80-81 (D. D.C. 2006).

Accordingly, the Court will award the sum of $20,000.00 as an
incentive award to each of the seven named class representatives

herein.

The final remaining issue which must be decided herein pertains to the request of class counsel for attorneys' fees and costs.  Class counsel seek to be compensated at a percentage rate of 37% of the common fund, originally constituted at $9.375 million, together with the interest which has accrued thereon while on deposit.  Class counsel request that the Court award a single amount as attorneys' fees and one for total costs, which counsel will divide amongst themselves in a fair and equitable fashion.

The jurisprudence has long recognized that, under a theory of equity known as the "common benefit" doctrine, a party preserving or recovering a fund for the benefit of others in addition to himself may recover his costs, including attorneys' fees, from the property or fund itself or directly from the other parties enjoying the benefit.  Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S. Ct. 745, 749 (1980);  Trustees v. Greenough, 105 U.S. 527 (1882); Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 258, 95 S.Ct. 1612, 1621-22 (1975).  As a general rule in Louisiana, the right of an attorney to remuneration for services is dependent upon a contract, either express or implied.  Louisiana State Mineral Board v. Abadie, 164 So.2d 159, 166 (La. App. 1st Cir. 1964).  An exception to this rule is recognized in those instances where an attorney, alone and at his own expense, has successfully

maintained an action for the preservation, protection, increase, or creation of a fund in which persons other than his own clients may share or from which they may benefit.  Kirkpatrick v. Young, 456 So.2d 622, 625 (La. 1984); In re Interstate Trust & Banking Company, 235 La. 825, 843, 106 So.2d 276, 282 (La. 1958).  In such instances, equity requires that all who benefit must pay the costs and expenses incident thereto, including attorneys' fees.  Indeed, Rule 23(h) formally recognizes the equitable power of the court to set common benefits fees in the class action setting in that it provides as follows:

> In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. ...

There would appear to be two methods by which the Court can calculate attorneys' fees herein, i.e., the lodestar method or an award of a percentage of the fund.  A "lodestar" fee award is computed by multiplying the number of hours expended by the attorneys' hourly rates.  That figure may then be adjusted upward or downward in the discretion of the Court based upon the twelve factors set forth in Johnson v. Georgia Hwy. Express, Inc., 488 F.2d 714, 717 (5th Cir. 1974).  The twelve Johnson factors include: 1) the time and labor required; 2) the novelty and difficulty of the question involved; 3) the skill requisite to perform the legal

43

service properly; 4) the preclusion of other employment by the attorney(s) due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and the length of the professional relationship with the client; and, 12) awards in similar cases.  Id. at 717-19.

As has been noted by other courts, the Fifth Circuit seems to accept a "blended" approach, wherein a percentage fee method is used with analysis of the Johnson factors to assure the fairness of the amount awarded.  Turner v. Murphy Oil USA, Inc., 422 F.Supp.2d 676, 682 (E.D. La. 2006); In re Bayou Sorrel Class Action, 2006 WL 3230771 at *3 (W.D. La. 2006).

The Court initially notes that, in Louisiana, it is not uncommon for contingency fees to be at least 40% when matters have been thoroughly prepared for litigation and proceed forward to trial.  Certainly most contingency fee contracts in Louisiana for tort-type personal injury suits command at least a 33.3% fee, even if settled pre-trail.  Therefore, the fee sought by counsel of 37% of amount of the fund is not, per se, unreasonable.

However, the Court notes that in the information published to potential class members, class counsel specifically advised the

44

class that a lesser percentage would be sought in fees.  <u>See</u> Rec.
doc. 174, Exhibit B(2) at page 5, wherein the following is noted:

> 24. How will the lawyers be paid?
>
> Class Counsel will ask the Court for attorneys' fees in the amount of 35% of the settlement fund, plus reimbursement of their expenses.  The Court may award more or less than these amounts.

This information was contained in the Class Notice and claim form circulated to the class which, the Court has reason to conclude, these people relied upon in determining whether to object to the proposed settlement.  Accordingly, the Court is of the opinion that counsel should be limited to the amount of fees that the class was advised would be sought herein, i.e., 35% of the settlement fund plus reimbursement of expenses.

Measuring this sum in light of the <u>Johnson</u> factors, the Court notes that counsel have documented the following number of hours as having been invested into the handling of this matter:

|  | Attorney hours | Staff hours |
| --- | --- | --- |
| Howell & Snead Law Firm | 326.70 | 380.83 |
| Mary E. Howell | 1,198.24 | 21.5 |
| D. Majeeda Snead | 1,514.31 |  |
| Christina Norris | 2,309.03 | 70.25 |
| Samuel S. Dalton | 2,763.84 | 188.63 |

```
          TOTAL                 8,112.12        661.21
```

Itemized time sheets documenting these expenditures of time have been furnished, as to which the Court has no reason to question the accuracy.   The Court notes that this has been a vigorously contested matter which has continued for over seven years.   The hours expended by counsel during this time reflect, and the Court has observed, the highest quality of dedication and professionalism by all class counsel who have had to litigate exceedingly hard to obtain the favorable result which has finally been achieved.   Class counsel have performed their duties and responsibilities in a highly capable manner for the best interests of the class.

Class counsel have advised the Court that an hourly rate of $350.00 per hour for their time would be appropriate.   That assertion has been supported through affidavits of class counsel and of other attorneys, i.e., William Rittenberg, William Wessel, William Quigley and Jack Dveirin.   See Rec. doc. 177, Exhibits G, H, I and M.   In addition, class counsel utilized the services of law students to perform some tasks involving research, investigation and interviews with some class members.   For that time and effort, class counsel have sought to have those individuals compensated at the rate of $75.00.   The Court does not take issue with the hourly rate sought by any class counsel in this

litigation or any of their support staff and approves same as appropriate for this long-fought litigation.

Counsel, therefore, seek a lodestar fee calculation for the experienced attorneys at 8,112.12 hours multiplied by $350.00 per hour which equals $2,839,242.00. To this sum 661.22 hours for support staff, i.e., students and paralegals, at a rate of $75.00 per hours for an additional $49,591.50 is sought. The total lodestar fee would, therefore, be calculated at $2,888,833.00. Counsel acknowledge an adjustment to this amount by subtracting $116,088.00 in interim fees already received should be taken out so that the final lodestar amount is $2,772,745.00. This final amount is $986,151 less than a fee calculated as a contingency recovery of 37% of the total award would yield, minus the interim fees paid, as class counsel calculate that 37% fee to be $3,758,896.00.

Counsel seek the application of a multiplier under the <u>Johnson</u> factors to increase the lodestar amount to the 37% contingency fee which was negotiated with the class representatives. In this case, counsel suggest that a multiplier of 1.355 to the lodestar figure of $ 2,772,745.00 would increase the attorney fee award to close to the contingency award sought of 37%. Although counsel will not be awarded more than 35% in fees, the Court notes these figures for comparison with other cases where multipliers were allowed.

In seeking such a multiplier to the lodestar, class counsel

specifically argue that, pursuant to factors (3) the customary fee, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case and (12) awards in similar cases, the Court would be justified in awarding such an increase.  The Court concurs with class counsel's argument on these issues.

As has been noted earlier, the customary contingency fee for representation of personal injury plaintiffs in this area, in cases less contentious than this one, ranges from 33.3% to upwards of 40% of the gross award plus costs.  As to the amount involved and the result obtained, the Court knows of no other settlement in the State of Louisiana where counsel have attempted to obtain relief pertaining to strip searches.  The result obtained herein was the first of its kind in this State.  The case was hard-fought at all times.  Furthermore, to obtain this large of a fund from a public entity and to maintain the fund post-Katrina when that entity was strapped for funds to make repairs and get up and running again was no small accomplishment.  Lastly, part of the hours sought herein pertain to injunctive relief which was obtained some years ago for which counsel did not receive payment following their accomplishments.

The attorneys involved in this matter are among the best civil rights attorneys in this area.  This was not a desirable case.

Few, if any, private attorneys would have taken on a project such as this.  It is hardly a popular cause to represent arrested individuals against law enforcement.  Lastly, as noted by class counsel, the attorneys representing the defendants vigorously represent their respective clients in **all** litigations, making plaintiffs' counsel work for every step forward they were able to achieve.  The resources of the defendants outstripped those of class counsel who were forced to invest money on which they have waited over seven years to obtain a return.

Finally, upward adjustment of lodestar fees has been approved in other cases.  See Wal-Mart Stores, Inc., supra, (increase to lodestar of 3.5 in antitrust class action deemed reasonable); Fischel v. Equitable Life Assurance Soc'y of U.S., 98 Fed. Appx. 581, 583 (9th Cir. 2004)(multiplier of 2 to class counsel's lodestar approved); Bernadi v. Yeutter, 951 F.2d 971, 975 (9th Cir. 1991)(multiplier of 2 to lodestar figure sought by class counsel in civil rights case appropriate to account for risk of contingent fee and to ensure that counsel will accept civil rights cases); Local 56, United food & Commercial Workers Union v. Campbell Soup Co., 954 F. Supp. 1000, 1004 (D. N.J. 1997)(agreed upon class counsel's fees with a 2.39 multiplier on the lodestar cross-check would not be reduced because such an award was fair and reasonable); Garza v. Sporting Goods Properties, Inc., 1996 WL 56247 at *33 (W.D. Tex.

49

1996)(multipliers of 3.5 and 4 were appropriate under the circumstances); <u>Thompson v. Connick</u>, 2007 WL 1772060 at *4 (E.D. La. 2007)(upward adjustment of 50% of fees approved); <u>Faircloth v. Certified Fin. Inc.</u>, 2001 WL 527489 at *10 (E.D. La. 2001)(multiplier of 3 to enhance lodestar approved which resulted in fees of roughly 35% to counsel).

Additionally, class counsel have itemized common fund court costs and expenses incurred by them as follows:

| | H&S | Howell | Snead | Norris | Dalton |
|---|---|---|---|---|---|
| Airfare | | | | $20,696.42 | |
| Car Rental | | | | 10,277.71 | |
| Fax | | $178.25 | | 396.91 | 89.80 |
| Overnight Mail | $106.66 | 22.40 | 26.16 | 437.40 | 1,003.29 |
| Auto Fuel | | | | 607.13 | |
| Postage | | 24.33 | | 28.22 | 219.05 |
| Copying | 1,046.53 | 1,272.55 | | 2,672.59 | 4,574.93 |
| LD Calls | 160.05 | 77.76 | | 1,381.41 | 48.14 |
| Parking | 40.50 | 36.00 | 9.00 | 2,352.88 | 38.25 |
| Mileage | 29.82 | 23.58 | | 642.76 | 570.88 |
| Court costs | 150.00 | | | | |
| Experts/Consultants | | 9,315.81 | | 12,696.52 | 13,951.51 |
| Investigative | 472.50 | | | | 102.90 |
| Ct. Reporting | 571.65 | | | | |
| Legal Courier | 579.50 | 41.00 | | | 692.31 |
| Computer Assisted Research | 1,467.81 | 478.97 | | 147.76 | 6,326.43 |
| Contract Labor | 100.00 | 900.00 | 150.00 | 510.00 | |
| Mediation Fee | | 1,250.00 | 1,250.00 | 1,250.00 | |
| Airport (Misc.) | | | | 750.00 | |
| Airport tips | | | | 70.00 | |
| Toll | | | | 6.00 | |
| Lodging | | | | 485.00 | |
| Meals | | | | 169.06 | |
| Taxi Fare | | | | 12.50 | |
| Publication | | | | 50.00 | |
| Misc. Office Expenses | | | | 278.00 | 1,749.87 |

TOTALS:      $4,725.02 $13,620.64 $1,435.16  $55,918.81  $29,434.86

Total class counsel costs incurred through September 9, 2007 equal $105,134.49 from which must be deducted an interim cost paid by defendants in the amount of $21,667.18.   Therefore, class counsel have sought reimbursement for the sum of $83,467.31 for which they are clearly entitled.  See Rec. doc. 177, Exhibit N.

The Court further notes that the class was notified of the fact that counsel were seeking fees, together with the percentage which counsel were asking, as well as the fact that counsel were seeking reimbursement for their costs.  As with the settlement as a whole, there were very few individuals expressing discontent with the amounts sought.

For the foregoing reasons, the Court is of the opinion that a 35% award of fees sought by counsel is appropriate and will award that amount of fees and costs as sought hereinabove.  Furthermore, the settlement as otherwise presented to the Court will likewise be approved for the reasons set forth above.

New Orleans, Louisiana, this 17th day of ____July____, 2008.


ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE